UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 11-10299-DJC |
| | ) | |
| | ) | |
| DONDRE SNOW | ) | |

### GOVERNMENT'S SENTENCING MEMORANDUM

**Iris Murdoch writes that, to respond to the world justly you have to first perceive it clearly, and this requires a kind of 'unselfing.' '[A]nything which alters consciousness in the direction of unselfishness, objectivity and realism is to be connected with virtue.' '[V]irtue is the attempt to pierce the veil of selfish consciousness *and join the world as it really is.*'[1]**

Crawford, *Shopcraft as Soulcraft*--An Inquiry into the Value of

Work (Penguin Books, 2009), pp. 99-100 (emphasis supplied).

The world "*as it really is*," at least in Dorchester,

Roxbury, and Mattapan,[2] is one of drug trafficking, violence, and

---

[1]  Iris Murdoch, *The Sovereignty of Good* (London Routeledge Classics, 2001), p. 84, 92

[2]  See Braga, "Losing Faith?  Police, Black Churches, and the Resurgence of Youth Violence in Boston," 6 Ohio State Journal of Criminal Law Volume 1 at 141-172 (Fall 2008) pp. 6-7 (identifying Boston homicide offenders as young men of color from Roxbury, Dorchester, and Mattapan, between the ages of 18 and 24 (with an additional 20.7% under the age of 17), who were well known to the criminal justice system and involved in area gangs (with that number increasing to 76.9% in 2006)("hereinafter, "Losing Faith").  As Braga summarized the profile of these offenders: "Most of the violence is highly concentrated in a few places and among few youth.  These youth tend to be criminally active, gang-involved offenders who were well known to the criminal justice system and caught up in ongoing cycles of retaliatory street violence."  The victims in the indiscriminate violence are often innocent third parties either misidentified by

unchecked fear.  Despite reductions in overall crime rates, the simple fact is that, as we move into the Spring of 2012, innocent residents in small portions of our district continue to step around drug transactions, duck gunfire, and live in fear for themselves and their children.

These residents are periodically quoted in the Boston Globe when the carnage briefly surfaces on the public radar screen. See, e.g., "No arrests in deadly Roxbury shooting" Boston Globe (October 7, 2011) (discussing shooting of two Warren Gardens maintenance workers shot as they approached the project on repair call); "2 men shot in Roxbury; 1 Critical" Boston Globe (August 23, 2011) (detailing double shooting in Warren Gardens days after peace rally);  "Cops: Shooting of Toddler was Gang Related" Boston Herald (June 28, 2011)(detailing incident in which stray gunfire hit a toddler at Harambee Park); "Savagery Meets its Match in Love," Boston Globe (June 6, 2010) (highlighting loss endured by victim's family and the general fear affecting youth in many Boston neighborhoods); "When Fear Fills the Field" Boston Globe (September 21, 2010) (Pop Warner football team forced to duck from nearby gunfire while practicing in Dorchester playground)(all attached as Exhibit 1).  Countless other

---

their assailants or others unlucky enough to get caught up in the gunfire.  In 2009, for example, the 227 shootings in Boston produced 54 innocent third-party victims who included girlfriends, neighbors, and complete strangers who were not intended targets of the shooter and just happened to be in the wrong place.

residents remain prisoners in their own homes, peering out from out their blinds in fear, keeping their kids inside, and wondering when the cops, the courts, and their community leaders are going to *do something*.  E.g., "Held Captive by Violence," Boston Globe (June 8, 2010) (discussing young mothers on Creston Street "whose children are held hostage by young men with guns"); "On Creston Street, Fear and Caution Rule," Boston Globe (June 14, 2010) (follow up on life for residents of Creston Street, "a one-block, one-way stretch in the heart of Grove Hall on the Roxbury-Dorchester Line where residents live in fear")(both attached as Exhibit 2).[3]

And the tragedy is compounded by the realization that the individuals responsible for this misery are (like Dondre Snow) little more than children themselves. On July 16, 2010, the Boston Globe reported that the individuals charged with executing 14 year old Nicholas Fomby-Davis were 16 and 20 years old. See "Prosecutor Tells of Boy's Shooting as 2 Are Arraigned," Boston Globe (July 16, 2010)(assailants alleged to have stopped Fomby-

---

[3]  This article stated that 10 people had been shot and stabbed on Creston Street in the last decade and noted that Creston Street, "[s]et amid a notorious gang battle zone, has been a no-man's land where gang members from surrounding streets have ventured for vendettas, drugs, and turf.  Often the ones hurt are innocent bystanders."  The article also noted that most residents "are barricading their families indoors and coping with the nagging dread that their child-heading to school, the corner store, or the street to play, will be the next unlucky one."

Davis apparently mistakenly; one nevertheless held him down while his compatriot fired three shots into Fomby-Davis' body; one of the assailants was also alleged to have threatened the off-duty officer who witnessed the shooting and then ordered both assailants to the ground).  More recently, two eighteen year-olds were arraigned for the murder of 16 year-old Jaivon Blake and the shooting of his 14 year-old friend last Summer in Dorchester. "Two teens arraigned in Dorchester Shootings" Boston Globe (November 4, 2011)(all attached as Exhibit 3).  None of this should be any surprise because the literature confirms that the age of these alleged shooters is the rule rather than the exception.  E.g., "Losing Faith" at 7-8 (noting that "most" Boston homicide victims and offenders were between 18 and 24 and 25% of victims and additional 20% of offenders were under the age of 18). See PSR at ¶¶49 (Snow pulls knife on victim at age 13); 53 (at age 15, Snow and a second juvenile beat and rob a victim for his cell phone); 60 (pending case in which Snow is charged with possessing firearm found inside Warren Gardens Apartments three days after area shooting).

It's easy to say all this.  But the implications are much harder.  What does it mean as the Court prepares to sentence Dondre Snow and determine both the appropriate period of incarceration and how it can best use the 6-years of supervised

release to move Dondre Snow's life in a more positive direction.[4]

An appropriate starting point for this analysis is the lethal effects that guns, drugs and gangs have in our city and elsewhere.  <u>See</u> Kennedy, "Deterrence and Crime Prevention: Reconsidering the Prospect of Sanction" (Routeledge Studies in Crime and Economics 2009), p. 78 ("There is an embarrassment of riches on the high rate of gang offending") (hereinafter, "Kennedy").  <u>See also</u> Braga, <u>et al</u>. "New Approaches to the Strategic Prevention of Gang and Group Involved Violence" in C. Ronald Huff (ed), *Gangs in America,* (Sage Publications 2002)(gangs representing less than 1 percent of the population were responsible for at least 60% of the homicides in Boston and at least half the homicides in Minneapolis, Baltimore, and Indianapolis).[5] <u>See generally</u> United States Sentencing Commission, "Cocaine and Federal Sentencing Policy," (May, 2007) at 86 ("According to [Professor Alfred] Blumstein, the [40% reduction in national violence since 1993] is attributable to a

---

[4]   The defendant is unfortunately a likely candidate to recidivate.  <u>See</u> "Massachusetts Recidivism Study: A Closer Look at Releases and Returns to Prison" (Urban Institute 2008) (recognizing high recidivism rates for young, single African American males in Massachusetts study of inmates released in 2002)(available at <u>www.urban.org/publications/411657.html)</u>.  This study is significant because it identifies incarceration under a drug mandatory minimum as a factor that significantly *reduces* recidivism rates.  <u>Id</u>. at 15.  This in turn suggests that a sentence that is sufficiently long to break the bonds with an offender's former life may well facilitate rehabilitation.

[5]   As set forth above, this number for Boston had climbed to 76.9% by 2006.

reduction in new users of crack cocaine and a consequent reduction in the crack cocaine street markets."). These statistics point to the solemn obligation a sentencing court has to carefully consider the public welfare when faced with repeat offenders who persist in being involved with gangs and drugs. y.

Second, while it may seem tiresome for the government to ask the Court to "send a message," that is exactly what needs to be done to ensure that the small number of youth in our city involved in the gang life understand the risks and costs of their behavior. See 18 U.S.C. §3553 (a)(1)(B) (sentencing goals include the need to afford adequate deterrence to criminal conduct). See also United States v. Politano, 522 F.3d 69 (1st Cir. 2008) (recognizing the importance of general deterrence in post-Booker sentencings based on specific community based issues); U.S.S.G. ch. 4, pt. A, introductory cmt. ("General deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence.").[6]  Deterrence can (but does not always) work to reduce crime and the misery imposed on innocent victims caught in the crossfire. See, e.g., McDowell, et al. "A

---

[6] Accord, Jeremy Bentham, The Rationale of Punishment 20 (Adamant Media 2003) ("General prevention ought to be the chief end of punishment, as it is its real justification. If we could consider an offence which has been committed as an isolated fact, the like of which would never recur, punishment would be useless. It would be only adding one evil to another."). available at http://www.laits.utexas.edu/poltheory/bentham/rp/.

Comparative Study of the Preventative Effects of Mandatory Sentencing Laws for Gun Crimes," 83 Journal of Criminal Law and Criminology 378-394 (1992) (mandatory sentences for gun crimes reduced violent crime in a pool of six cities).

But deterrence can matter only when the message is effectively communicated.  At least one commentator has correctly recognized that "the deterrence threat may best be viewed as a piece of advertising." Zimring and Hawkins, *Deterrence, the Legal Threat in Crime Control,* p.142 (Univ. Of Chicago Press 1973).

Through its sentences, this Court is in a unique position to send out messages to the target audience perpetrating the violence. Lenient sentences risk sending a message that the conduct at issue carries little risk from the criminal justice system.  Such messages can also undercut law enforcement efforts to make communities safer and exacerbate mistrust between the police and the people they serve. Compare Skogan et al.(eds) *Fairness and effectiveness in Policing: the Evidence (*National Academies Press 2001) at 6 ("Research has found that people obey the law not just because they are afraid of being punished or because they believe the law is morally right, but also because they believe the law and its enforcement is impartial and being fairly administered.").  On the other hand, sentences that take into account the seriousness of inner-city crime and the need to protect the great many innocent residents can help increase public confidence in the criminal justice system, make

communities safer, and deter others from committing new crimes.

The government respectfully suggests that, in view of the way our current world "*really is*," the message that needs to be heard (by Dondre Snow, his Warren Gardens confederates, and by young men all over the city) is that these crimes cannot be tolerated.  While that message can really only be effective if it is accompanied by an appropriate sentence, it is a message that needs to be heard *regardless of the sentence imposed.*  Not simply because shootings and drug disputes periodically generate headlines, but because persistent crime by young men in our city reflects a "culture of lawlessness" that cannot be accepted.[7]

## I. <u>A SENTENCE OF 24 MONTHS IS JUSTIFIED IN THIS CASE</u>

In view of all this, the government is seeking a sentence of 24 months. That is the middle of the advisory guideline range calculated in the PSR.  PSR at ¶107 (calculated range of 21-27

---

[7]  It is also important to note that the "message" cannot be framed merely as a period of incarceration, but rather as an comprehensive package including seemingly innocuous supervised release conditions that can sometimes have a greater deterrent effect than the prison sentence itself.  <u>See</u> Kennedy, "Deterrence and Crime Prevention" at 6-7 ("[S]ome of the most powerful steps [utilized as part of Operation Ceasefire in Boston] turned out to be very minor indeed....As part of the first Ceasefire gang crackdown, Massachusetts Superior Court Judge Sydney Hanlon ended up with a young gang member before her for the illegal possession of a firearm, facing the prospect of considerable prison time. He remained unmoved until she placed him under a pre-trial evening curfew, at which point he became extremely upset because he could not see his girlfriend.  She can come see you, Judge Hanlon told him.  No, he replied, his mother would not permit such a thing...We usually do not think of curfews—or mothers—as more onerous than years in prison.").

months). The government believes that it is fully justified in the overall circumstances of this case given the defendant's offenses (multiple drug sales and the theft of the CW's buy money during another attempted transaction),[8] his documented gang affiliation in Warren Gardens, the persistence and increasing seriousness of his criminal behavior, and the impact that drug trafficking and the violence associated with it has had (and will continue to have) on the Dudley Square community.

### A.   The defendant's criminal history

The PSR has correctly determined that Dondre Snow is in CHC IV based the wide range of offenses that he has to date committed. PSR at ¶¶49-52 (scored juvenile offenses). Those offenses were all committed between the ages of *13 and 15*. Id.

Surely, something must be tragically wrong when an individual can reach Criminal History Category IV before the age of majority. The tragedy here is that Dondre Snow's only response to everything the criminal justice system and a battery of social workers and mental health care professionals have done for him to date is to commit more crime. His persistent offending confirms that he is a serious risk to himself and his community and among the individuals still most likely to recidivate. See discussion at footnote 4, above. See also

---

[8]PSR at ¶¶13-30 (overall offense conduct and gang allegations).

U.S.S.G. § 4A1.1 (Introductory Commentary)(recognizing that *upward departures* may be particularly appropriate "in the case of younger defendants ... who are more likely to have received repeated lenient treatment, yet who may actually pose a greater risk of serious recidivism than older defendants").

In reaching this conclusion, the government relies on settled literature on the importance of juvenile offending as a predictor of future crime, <u>e.g.</u>, Johnson, et al. "Families Delinquency and Crime (The Roxbury Series in Crime, Justice, and Law 2004) at 16 ("one of the most widely accepted findings in criminology and developmental psychology is that childhood conduct problems are a strong predictor of subsequent involvement in antisocial behavior"), and the specifics of Snow's criminal justice involvement to date.  It is not the age at which Snow's offenses were committed that matter here, but rather the persistence and increasingly serious nature of his crimes.

Dondre Snow is only 19 years old.  But he has already been in the criminal justice system for six years *without interruption.*  PSR at ¶¶49-53.  During that time, he has acquired 5 determinations of delinquency, violated probation on every case in which it was imposed, had his DYS Parole revoked 8 times,[9]

---

[9] The PSR refers to "multiple parole revocations, returns to confinement, and releases on parole." PSR at 49.  The government reviewed the records that Probation received from DYS and counted *eight* listed parole revocations.

remains on DYS supervision until the age of 21 as a result of being prosecuted as a Youthful Offender after committing his second robbery (in which he and an accomplice kicked and beat a victim in order to steal a phone), and has repeatedly committed new crimes while under criminal justice supervision.  Id. at ¶¶49-53 (probation violations dated 8/13/07, 11/26/07, and 12/1/11; YO prosecution based on 11/7/08 robbery in which defendant punched victim knocking him to ground at which point accomplice kicked the victim defendant also found to be in possession of marijuana); ¶¶13-29 (defendant found to be a youthful offender and placed on probation in that case on June 3, 2010; made sales of cocaine on June 7 and 15, 2011 and stole CW's buy money on June 20, 2011).  All of this shows the appropriateness of a guideline sentence.  See United States v. Hernandez, 896 F.2d 642, 645 (1st Cir. 1990) ("a defendant "undermines the integrity of the criminal justice system when he commits a crime while ... under its supervision and control"); United States v. Garcia-Lara, 499 F.3d 1133 (10th Cir. 2007)(reversing substantial downward Booker variance where defendant was repeatedly incarcerated for short periods and then committed more crimes upon release) and United States v. Smith, 505 F.3d 463 (6th Cir. 2007) (imposing above guidelines sentence where it was obvious that prior incarceration "was obviously not sufficient to comply with the purposes of § 3553(a)(2)").

-11-

But there is more about the defendant's criminal record that should even be of greater concern to this Court.  Like the fact that, since he committed the offense of conviction  and at least three other crimes while on parole in a 13-day stretch last June, see PSR at ¶13-39, Snow is back in jail awaiting trial after a firearm was recovered near him in Warren Gardens three days after two young men were shot there. PSR at ¶¶58-59.  See also Summary of BPD Reports (Exhibit 4) at 26 (BPD Incident Report showed that Snow was arrested in front of 47 St. Richards Street, approximately 100 yards from the earlier shooting and that the gun recovered near him showed a positive heat signature when photographed with a thermal imaging camera).   That incident also took place within a similar distance from the spot that Snow claimed he was shot at during yet another incident but in which a firearm was recovered from *his* path of flight.  Id. at 20 (10/10/10 incident in which shots were fired near Warren Gardens, Snow claimed he was the target but firearm was located along his path of flight). Post-Booker, courts are not "required to turn a blind eye to relevant conduct that informed the Court as to where the sentence ought fall below [the] statutory maximum." United States v. Birkett, 501 F.Supp. 2d 269, 280 (D. Mass. 2007) (Young, J). See also United States v. Johnson,  631 F.Supp. 2d 946, 951 (E.D. Tenn 2009) (affirming above-guideline sentence based on, among other things, the frequency and escalating nature

of the defendant's crimes and the resulting need to protect the public).

**b.**   **The Defendant's Affiliation with the Warren Gardens Blunt Heads Street Gang**

Snow's crimes are particularly serious here because of the his documented affiliation with the Warren Gardens Blunt Heads, one of Boston's many street gangs and one that operates in the area of the Warren Gardens Housing Development and in Dudley Square.  See Gang Materials attached as Exhibit 5 (photographs) and 6 (BPD Gang verification).  The dangers of Snow's gang activities are heightened even more because of his involvement with both drugs and firearms.  See United States v. Mercado, 2009 WL 1770126, *2 (E.D.Wis. 2009) (recognizing seriousness of gun crimes when connected "even loosely to gang membership").

The defendant's gang activities are clear from the record in this case.  The photographs included in Exhibit 5 show the defendant bragging about his affiliation by making "W" signs and referencing "WGBH" (Warren Garden Blunt Heads) on photographs. Id.  His crime has consistently involved activities in the Warren Gardens area, including persistent and recurring returns to the Warren Gardens Apartments even during periods in which he had been ordered out of that property.  See PSR at ¶¶13-29 (the offense of conviction and other relevant conduct all took place in and around Warren Gardens even though defendant no longer lived there); 59 (defendant arrested for trespassing while in

-13-

Warren Gardens Apartments), 60 (defendant arrested in Warren Gardens for firearms offense three days after shooting).  See also Exhibit 4 (Summary of BPD Reports) at 9 (on 3/16/08 defendant flees from police while inside Warren Gardens with officers noting that he was clutching at his side while running away; although police did not recover gun, they did determine that Snow was wearing GPS bracelet and had stay-aways from Warren Gardens Apartments); 9 (defendant arrested inside Warren Gardens on warrant for DYS parole violation); 19 (defendant reports being shot at inside Warren Gardens Apartments but firearm is found along his path of flight).  The defendant's gang affiliation, whether expressed in terms of "association" or "membership," is another important aggravating factor in the sentencing mix.  See Huebner, et al. "Gangs, Guns, and Drugs: Recidivism Among Serious, Young Offenders," Criminology & Public Policy Vol. 6 Issue 2 (2007)("Gang membership, even within a high-risk sample, emerged as a significant predictor of recidivism as more traditional risks for offending, such as gun use, demographics, prior convictions, and community disadvantage, did not"); Braga et al., Losing Faith at 141-172 (noting that "much of the increase in youth homicide [in Boston] has been driven by a resurgence of gang violence" and that gang violence accounts for a "disproportionate share" of homicide and gun violence).  See also United States v. Hernandez-Villanueva,

-14-

473 F.3d 118 (4th Cir. 2007)(imposing above-guideline sentence based on defendant's gang activities).

All of which brings the government back to where it started this memorandum: the critical importance of doing what can be done to stem the tide of gang violence in this city and using the power of this court to let Dondre Snow and his associates know that continued crime in and around Warren Gardens cannot be tolerated. The government does not seek to lay the blame for all inner-city crime on Dondre Snow's shoulders. At the same time, he cannot run away from what he has so clearly participated in for so long. All of this shows that a sentence of 24 months is a fair and reasonable sentence which will fully support the purposes embodied in section 3553(a).

### c.   **The Offenses of Conviction**

Of course, Dondre Snow is charged with a drug offense in this case and not with any acts of violence. But he is also a person associated with both firearms *and* gangs. See discussion, above.  And even if he wasn't, the connection between the quality of life for the residents of Dudley Square (and other neighborhoods) and the trafficking of drugs simply could not be clearer. Attached as Exhibit 7 are maps showing the correlation between drug trafficking and various crimes of violence in the Dudley Square area where there are several housing projects, schools, and transportation centers. This is a section of our

city that should be a showpiece.  Instead, it is a hotspot for
drugs and the violence that drug trafficking invariably brings
with it. The sentence in this case simply must reflect these
realities and be directed at providing relief to the residents
most effected by the actions of Dondre Snow and others who see
the Dudley Square Area, not as an area of promise for the
community as a whole, but as a market for their drug
trafficking.[10] See United States v. Politano, 522 F.3d at 72
(court may consider particular community impacts under section
3553);  United States v. Martin, 455 F.3d 1227, 1240 (11th Cir.
2006) (recognizing that economically based crimes—as drug
trafficking is here—are "prime candidates for general
deterrence").

The defendant has also chosen to peddle drugs around
housing projects.  PSR at ¶¶13-39 (offense of conviction and
relevant conduct in Warren Gardens area).  He is thus a street

---

[10] If there was any further reminder needed regarding the
connection between drug trafficking and violence, it is the
shootings of five people in Mattapan.  See "Mattapan murders Fuel
City's Outrage" September 28, 2010; "Woolson Street in Anguish,
wonders Whether More Police Would Help (September 29, 2010)
(attached as Exhibit 5).  As was widely reported during the
recent trial, these were not believed to gang-related shootings,
but rather was another example of the continuing violence
connected with the drug trade in our city. Id.  See also Johnson,
"Patterns of Drug Distribution: Implications and Issues," 38
Substance Use and Misuse 1795 (2003) cited by the Sentencing
Commission for the proposition that "almost all crack cocaine
related violence of the 'systemic' type, that is violence that
occurs within the drug distribution process.").

trafficker who abuses the weakest among us. <u>See</u> <u>United States v.</u>
<u>Jenkins</u>, 2009 WL 1444438, *4 (E.D. Pa. 2009)(in memo dealing
with crack trafficker sentenced to 199 months in prison after
dealing in public housing project, court justified sentence by
noting that defendant operated "near a public housing authority
project, preying on those most vulnerable to the ills of drug
addiction"); <u>United States v. Gibbons</u>, 553 F.3d 40 (1st Cir.
2009)(affirming sentencing judge's refusal to vary where
defendant was dealing drugs in inner city housing project).
Snow, of course, is also not himself a user of cocaine, meaning
that he also sold this drug for money rather than to support his
own addiction. PSR at ¶92. <u>Compare</u> <u>United States v. Hairston</u>,
502 F.3d 378 (6th Cir. 2007) (affirming 51% reduction from
guideline range where defendant sold crack cocaine to support
his own dependence).

## II.  <u>POTENTIAL MITIGATION FACTORS</u>

It is not clear what mitigating factors will be raised in
this case. As set forth above, the defendant's youth may
actually make it more likely that he will commit more crime when
he is released.  <u>See</u> discussion at pp. 3-4 (discussing the age
of offenders and victims in Boston).  While the government is
also cognizant of the mental health issues referenced in the
PSR, such conditions are often more correctly viewed as
sentencing aggravators. <u>See</u> <u>United States v. Wimberly</u>, 2009 WL

17

2462371, *3 (10th Cir. 2009) (affirming denial of variance where
mental health issues made it more likely that defendant would
recidivate); United States v. Sicher, 576 F.3d 64, 74 (1st Cir.
2009)(affirming denial of variance based on mental heath issues
where sentencing judge concluded that major depression,
borderline personality disorder, and compulsive gambling
disorder were "not the kind of mental state to excuse this
criminal behavior").  While these issues certainly warrant
judicial recommendations and special conditions of supervised
release, they do not counsel for a sentence below 24 months.
United States v. Williams, 333 Fed.Appx. 63, 71 (6th Cir. 2009)
(recommendation that a defendant receive mental health or
substance abuse treatment while incarcerated is appropriate
weighing of Section 3553(a) factors).

### III.  <u>SUPERVISED RELEASE</u>

The defendant must be placed on supervised release for at
least six years.  During that period, Dondre Snow should be
required to comply with special conditions he will need to
change the direction of his life.

### A.  <u>The Defendant Should Be Ordered to Stay Away From the Dudley Square Area and  from His Historic Criminal Associates</u>

An important component of the overall sentence the
government is recommending is that the defendant stay away from
the Dudley Square/Warren Gardens area and away from his gang

compatriots including those individuals with whom he has previously been associated with in criminal activity.  The proposed exclusion zone has been a component of much of the defendant's crime even after he no longer lived there.  <u>See</u> discussion, <u>above</u>.  As the defendant's own mother has recognized, the people  Dondre Snow has been spending time with may be an even greater problem because they can create opportunities for him to commit more crime and would encourage him to return to areas of the city where he might again be targeted.  PSR at ¶72 (defendant's mother recognizes that he is "a follower" and that "this has contributed to some of his criminal record as he has willingly gone along with his peers when they make poor decisions").

    The purpose of these restrictions is to keep the defendant in a new environment where there will be fewer opportunities to commit crime and where the defendant will be able to focus on other rehabilitative efforts. <u>See</u> Cullen, "Environmental Corrections – A New Paradigm for Effective Probation and Parole Supervision," 66 Federal Probation 2, 28-37 (Sept. 2002) ("[t]he effectiveness of probation and parole supervision will be increased to the extent that officers systematically. . .reduce the extent to which offenders are tempted by and come into contact with opportunities for crime."). The proposed restrictions simply make sense where much of the troubles that

the defendant has experienced are specifically related to a specific area and an identifiable group of "friends."

The government suggests that these conditions be imposed without prejudice to the defendant's right to seek modification based on changed circumstances and that his Probation Officer be permitted to waive the geographic restriction during daylight hours as he or she believes is appropriate following the first year of supervised release so that he may visit any family living inside the exclusion zone. See United States v. Garrastequy, 559 F.3d 34 (1st Cir. 2009) (affirming 12 year restriction from Suffolk County where restrictions included similar provisions). Proposed restrictions are attached as Exhibit 8 and are drafted to permit the defendant to live at his mother's current address.

### B. Vocational Training/Education

The government also recommends that the defendant be required to attain his GED or be provided such vocational training as Probation determines is available and appropriate.

### C. Specialized Treatment

Drug treatment is not needed in this case. See PSR at ¶92-93 (defendant describes prior marijuana use and drinking as causing "no problems"). Drug testing should be ordered on a regular basis.

### D. Mental Health Counseling

Mental health counseling, on the other hand, should

continue as long as the defendant remains in custody and should constitute an important component of his rehabilitation while on supervised release. See United States v. Gautier, 590 F. Supp. 2d 214, 235 (D. Mass. 2008)("Studies suggest the significance on recidivism of a consistent plan, beginning in prison and extending into reentry."). The government recommends that the defendant receive a comprehensive neuro-pyschological examination upon release and that he undergo follow up treatment as deemed appropriate by his Probation Officer.

### E. <u>Curfew</u>

The government also recommends that the defendant be subject to a 9 p.m.-6 a.m. curfew for the first year of supervised release to help his transition.  This restriction should be subject to modification by his Probation Officer for work or other programming but should be enforced by electronic monitoring.

### F.    <u>Referral to the ReStart Program</u>

The government also asks that the Court recommend that the defendant be considered for the ReStart Program and any similar programs available at the time of his release.

### IV. <u>CONCLUSION</u>

The government requests that the Court impose a sentence of 24 months, no fine, six years of supervised release and the

special conditions set forth above.

Respectfully submitted,

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

By:   /s/ John A. Wortmann, Jr.
JOHN A. WORTMANN, JR.
Assistant U.S. Attorney
One Courthouse Way
Boston, MA
(617) 748-3207

## CERTIFICATE OF SERVICE

The government hereby certifies that the foregoing was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

/S John A. Wortmann, Jr.  3/28/12
JOHN A. WORTMANN, JR.
Assistant U.S. Attorney